UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------- X

KATHLEEN MAYS, Ph.D.,                          Case No.: 07 CIV 5976 (BSJ)

                Plaintiff,

     vs.                                      **DEFENDANTS' STATEMENT OF
                                                UNDISPUTED FACTS**

WASHINGTON SQUARE INSTITUTE FOR
PSYCHOTHERAPY AND MENTAL HEALTH,
GERD H. FENCHEL, Ph.D.

               Defendants.

----------------------------------------------------------- X

      Pursuant to Local Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Defendants Washington Square Institute for Psychotherapy and Mental Health ("WSI" or "Institute"), and Dr. Gerd Fenchel ("Dr. Fenchel") (collectively "Defendants") set forth the following statement of material facts as to which they contend there is no genuine issue to be tried:[1]

**About The Institute[2]**

      1.     The Institute is the first not-for-profit psychoanalytic training center in lower Manhattan. Declaration of Diane Krebs, dated March 19, 2010 ("Krebs Decl."), Ex. 11. The Institute's mission is to spread psychoanalytic concepts and principles to the lay and professional community through the provision of scientific conferences and meetings, lectures and presentations designed to educate the professional community and enhance the welfare of the public at large. *Id.* WSI also offers psychotherapy services to patients weekly on a sliding fee scale. *Id.*

---

[1]     The following statement of material facts about which there is no genuine issue to be tried is made solely for purposes of Defendants' Motion for Summary Judgment. Therefore, Defendants are conceding for purposes of this motion several facts contended by Plaintiff. Should any part of Plaintiff's complaint survive this motion, Defendants reserve the right to dispute Plaintiff's version of events, including those portions contained in this Statement, at trial.

[2]     Headings are used in this Statement solely for organizational purposes and the convenience of the reader; they are not intended to be, nor should they be construed as, assertions of fact.

2.      The Institute provides its services by trained professional psychotherapists and analysts who have undergone postgraduate training in this specialty and is accredited by the American Psychological Association for continuing education programs for psychologists. Krebs Decl. Ex.11. The Institute is also actively involved with the National Association for the Advancement of Psychoanalysis, the International Federation for Psychoanalytic Education, the Association of Autonomous Psychoanalytic Institutes and the American Psychological Association, Division of Psychoanalysis, Section I. *Id.*

3.      Derek Wolman, an attorney, has been a member of the Institute's Board of Trustees since 2005. Krebs Decl. Ex. 10 at 42. Other members of the Board include: Marvin Weinstein, president; Eric Fenchel; Robert Marcus; Gabriel Spiler and Dr. Fenchel. Krebs Decl. Ex. 6 at 124-29; Krebs Decl. Ex.12.

4.      It is the practice of the Board to approve all major decision decisions regarding appointment of senior staff. Krebs Decl. Ex. 10 at 51. However, Dr. Fenchel, in his capacity as director of the Institute, has the primary responsibility for hiring therapists to work for the organization. Krebs Decl. Ex. 6 at 75.

5.      Wolman drafted a sexual harassment policy for the Institute, applicable to students and faculty, which was instituted in 2001. Krebs Decl. Ex. 10 at 118-120; Krebs Decl. Ex. 11. However, even before the policy came into effect, the Board was required to investigate a complaint of discrimination or harassment. Krebs Decl. Ex. 6 at 138.

6.      The Institute is well-known in the community and has a good reputation. Krebs Decl. Ex. 2 at 70.

**About Dr. Gerd Fenchel**

7.      Dr. Fenchel received a bachelor's degree in 1949 and a Master of Science in psychology in 1950 from the College of the City of New York. Krebs Decl. Ex. 6 at 12. He received a Ph.D from the New York University Graduate School of Arts and Science. Krebs Decl. Ex. 6 at 13.

8.      Dr. Fenchel has been married to his present wife, Leslie, since 1989. Krebs Decl. Ex. 6 at 97.

9.      Dr. Fenchel has maintained his own private therapy practice in Manhattan for more than 30 years. Krebs Decl. Ex. 6 at 39.

10.    Dr. Fenchel co-founded WSI, then called the Washington Square Consultation Center, in or about 1959. Krebs Decl. Ex. 6 at 37-38.

11.    Dr. Fenchel was originally assigned to the position of Director of Psychological Services. Krebs Decl. Ex. 6 at 40.

12.    Dr. Fenchel retained that title until the organization was chartered by the board of regents as an educational institute, at which time its name changed to the Washington Square Institute. Krebs Decl. Ex. 6 at 42. At that time, Dr. Fenchel became the director and has held that position through to today. Krebs Decl. Ex. 6 at 42-43; Krebs Decl. Ex. 13.

13.    As director, he oversees the educational and treatment parts of the organization, as well as oversees administrative duties, such as patient assignments, fee evaluations, applications, emergencies, and therapists' complaints. Krebs Decl. Ex. 6 at 44. He reports directly to the Board, of which he has himself been a member since the Institute's formation. Krebs Decl. Ex. 6 at 45.

14.    During the course of his tenure with the Institute, Dr. Fenchel has also functioned as the dean. Krebs Decl. Ex. 6 at 43-44.

15.    Dr. Fenchel has authored and/or edited several books, including: Psychoanalysis at 100: An Issues in Ego Psychology Book Commemorating the Thirtieth Anniversary of Washington Square Institute for Psychotherapy; Developing Ego & the Emerging; Psychoanalytic Reflections on Love and Sexuality; and The Mother-Daughter Relationship: Echoes Through Time. Krebs Decl. Ex. 6 at 103-104.

**About Plaintiff Kathleen Mays**

16.    Plaintiff Kathleen Mays ("Plaintiff") graduated from the Medical College of Virginia, School of Nursing with a Bachelors of Science in Nursing in 1968. Krebs Decl. Ex. 2 at 35-36. Thereafter, she attended New York University's program entitled "Psychiatric Nursing of the Adult," and graduated with an MSN in 1974. Krebs Decl. Ex. 2 at 36. She also attended the Greenwich Institute for Psychoanalytic studies and received a certificate for psychotherapy in 1978. Krebs Decl. Ex. 2 at 37.

17.    Plaintiff graduated in 1986 from Yeshiva University with a Ph.D. in psychotherapy. Krebs Decl. Ex. 2 at 39.

3

18.     Plaintiff has maintained her own psychotherapy practice in Manhattan for the last eighteen years. Krebs Decl. Ex. 2 at 51-52.

19.     Plaintiff began working at the Institute in 1990. Krebs Decl. Ex. 2 at 70.  She interviewed with Dr. Fenchel and was hired by him as a clinical supervisor. Krebs Decl. Ex. 2 at 70-72, 74-78.  In that role, therapists at the Institute contacted Plaintiff to discuss and get advice on their own clinical cases. Krebs Decl. Ex. 2 at 71-73.

20.     A year or two after she started at the Institute, Dr. Fenchel asked Plaintiff to teach a course. Krebs Decl. Ex. 2 at 81-82.  She was subsequently asked to become a member of the faculty, in addition to her clinical supervision duties. Krebs Decl. Ex. 2 at 86, 92.

21.     In 2000, Dr. Fenchel asked Plaintiff to take on an additional, part-time position as coordinator of special projects and affiliations.  Krebs Decl. Ex. 2 at 101.  Plaintiff's responsibilities included responding to letters and calls from therapists who were interested in becoming staff therapists for the Institute, as well as handling additional special projects such as visiting referral sources in the community and conducting demographic studies within the Institute.  Krebs Decl. Ex. 2 at 101-02.  Plaintiff also continued her role as a faculty member and clinical supervisor.  Krebs Decl. Ex. 2 at 102-03.

22.     In or about 2001, Dr. Fenchel's wife suggested to him that Plaintiff might be a good potential successor for him, should he decided to retire at a future date.  Krebs Decl. Ex. 8 at 432-35.  Accordingly, Dr. Fenchel called Plaintiff and inquired whether she would be interested in learning about his role within the Institute. Krebs Decl. Ex. 2 at 131.

23.     When Dr. Fenchel approached Plaintiff about learning his position, he did not provide a time frame as to when a transition might occur or when he might retire.  Krebs Decl. Ex. 3 at 272, 274.  Plaintiff understood that Dr. Fenchel would have to retire or set a date to retire before she would assume the position of director.  Krebs Decl. Ex. 3 at 274. He also did not give her any guarantee that she would become his successor.  Krebs Decl. Ex. 3 at 272.

24.     To date, Dr. Fenchel does not, nor has he ever had, an intention or particulate date upon which he will retire.  Krebs Decl. Ex. 3 at 274; Krebs Decl. Ex. 8 at 445-446.  Mays also testified that Dr. Fenchel did not have any obligation at any particular time to quit his position in order to allow her to become the director. Krebs Decl. Ex. 4 at

4

529.

25.     Plaintiff was honored by the offer.  Krebs Decl. Ex. 2 at 133-34.  Plaintiff told Dr. Fenchel she would be interested in proceeding.   Krebs Decl. Ex. 2 at 135.

26.     At or around this time, Plaintiff began regularly attending board meetings and continued to do so throughout her tenure with the Institute.  Krebs Decl. Ex. 2 at 159.

27.     Dr. Fenchel suggested weekly meetings between them would be appropriate for her training.  Mays Dep. at 136.  Plaintiff and Fenchel met on varying days, as their schedules permitted, for luncheon meetings.  Krebs Decl. Ex. 2 at 138.  The luncheons continued during her entire tenure.  Krebs Decl. Ex. 2 at 155.

28.     During the luncheon meetings, Dr. Fenchel advised Plaintiff about the organization, its history, how he spent his day and the challenges he faced as director, including: hiring and maintaining faculty; collection of fees; and resistance to acceptance of insurance.  Krebs Decl. Ex. 2 at 140.  Plaintiff found the luncheons to be helpful.  Krebs Decl. Ex. 2 at 141.

29.     Dr. Fenchel also indicated that, because he and Plaintiff would be working closely together, he wanted them to have a friendly relationship.  Krebs Decl. Ex. 2 at 144. During the meetings, Dr. Fenchel shared things about his weekends and inquired as to Plaintiff's weekend.  Krebs Decl. Ex. 2 at 141.  Dr. Fenchel also talked about his children and his marriages, the death of his cousin, memories of his grandmother, his immigration from Europe to England, religion, and a bit about his relationship with his wife. Krebs Decl. Ex. 2 at 148, 170-73.

30.     Plaintiff also began to share personal information about herself with Dr. Fenchel beginning in or about 2002.  Krebs Decl. Ex. 2 at 143.  Plaintiff told Dr. Fenchel about her strict southern religious upbringing.   Krebs Decl. Ex. 2 at 146.   She also discussed the fact that she had a younger brother who was married and her feelings regarding her sister-in-law, as well as the fact that she had previously been married.  Krebs Decl. Ex. 2 at 146-47.

31.     Although Plaintiff was reluctant to share personal information about herself with Dr. Fenchel, Dr. Fenchel never indicated that something negative would happen to her if she chose not to reciprocate and share information. Krebs Decl. Ex. 2 at 145.

32.     On occasion, Plaintiff felt Dr. Fenchel shared more personal information about himself than she was comfortable with. Krebs Decl. Ex. 2 at 152-53. However, she did not tell Dr. Fenchel, or anybody else, that it made her uncomfortable. Krebs Decl. Ex. 2 at 153.

33.     Dr. Fenchel believed that he and Plaintiff were friends. Krebs Decl. Ex. 7 at 251.

34.     In the fall of 2003, Dr. Fenchel advised her he was going to create an assistant director position. Krebs Decl. Ex. 2 at 139, 153, 157. With Board approval, Dr. Fenchel created the position of Assistant Director for Plaintiff. Krebs Decl. Ex. 8 at 477-78. At the time Dr. Fenchel told Plaintiff of the position during a lunch, Plaintiff kissed him on the nape of the neck to thank him and told him that their working relationship was like a marriage. Krebs Decl. Ex. 7 at 224.

35.     Dr. Fenchel formally announced the creation of the position to the rest of Institute in January 2004. Krebs Decl. Ex. 2 at 154.

36.     With this new position, Plaintiff was given a salary and was expected to work full days on Mondays and Wednesdays, and Friday afternoons and evenings. Krebs Decl. Ex. 2 at 156-57.

37.     Plaintiff's written employment agreement stated she would be paid for one week of vacation per year (not a full week, but the three days she was assigned to work per week). Krebs Decl. Ex. 3 at 451; Krebs Decl. Ex. 4 at 535; Krebs Decl. Ex. 14.

38.     However, in May 2005, after returning from a week's vacation, Dr. Fenchel told Plaintiff he would pay her for vacation time she took. Krebs Decl. Ex. 3 at 450-51. This alleged new agreement was never put in writing nor was it approved by the Board and by Plaintiff's own admission, was voluntary and discretionary. Krebs Decl. Ex. 4 at 535-36; Krebs Decl. Ex. 16.

39.     After accepting the newly created assistant director position, Plaintiff also continued to perform clinical supervisory responsibilities and continued to teach a course at the Institute. Krebs Decl. Ex. 2 at 163-64.

40.     As assistant director, Plaintiff was initially assigned various tasks to assist Dr. Fenchel in his role as director. Krebs Decl. Ex. 2 at 157. However, the role eventually

6

evolved and included more specific tasks, such as reviewing requests for patient fee changes.  Krebs Decl. Ex. 2 at 158.

41.   Plaintiff also interviewed prospective faculty and supervisors with Dr. Fenchel and discussed whether or not to hire them.  Krebs Decl. Ex. 2 at 159.  Dr. Fenchel was receptive to her input on the subject.  Krebs Decl. Ex. 2 at 160.

42.   Plaintiff was also required to provide periodic reports at board meetings, as assigned by Dr. Fenchel.  Krebs Decl. Ex. 2 at 161.  As one example, Plaintiff prepared a project indicating what the Institute needed to be accredited as a licensure-granting Institute in the wake of a new licensing law.  Krebs Decl. Ex. 2 at 161-62.

43.   After she began to assume responsibilities as assistant director, Plaintiff and Dr. Fenchel interacted with each other six to twelve times per day.  Krebs Decl. Ex. 3 at 271.

**Personal Positive Interactions with Dr. Fenchel**

44.   Plaintiff voluntarily and willingly went to Dr. Fenchel's home in the Poconos on several occasions.  Krebs Decl. Ex. 3 at 276; Krebs Decl. Ex. 7 at 336.  She went on a regular basis with the rest of the Institute faculty for meetings.  *Id.*  She also went to his home two to three times on non-business-related occasions.  *Id.*

45.   Plaintiff went to Dr. Fenchel's home in 2003 after the death of her brother. Krebs Decl. Ex. 3 at 277.  Dr. Fenchel and his wife invited her there.  Krebs Decl. Ex. 3 at 277.  She went from Friday evening through Sunday afternoon.  Krebs Decl. Ex. 3 at 277. Dr. Fenchel and his wife were very gracious hosts and Plaintiff enjoyed her visit.  Krebs Decl. Ex. 3 at 277-78.

46.   Plaintiff went another time to Dr. Fenchel's Poconos home in 2004, for relaxation purposes, after the death of her father.  Krebs Decl. Ex. 3 at 278.  She went for the same time period as she had previously – Friday evening until Sunday afternoon.  Krebs Decl. Ex. 3 at 279.  She again enjoyed herself at their home.  Krebs Decl. Ex. 3 at 279.

47.   On the occasions she went to his home, Plaintiff gave Dr. Fenchel and his wife a gift, including a set of coasters, a photo album and others.  Krebs Decl. Ex. 3 at 285.

48.   Plaintiff believed that Dr. Fenchel had invited other individual faculty members

to his home, as well. Krebs Decl. Ex. 3 at 282.

49.     After a trip to Venice in May 2006, Plaintiff brought Dr. Fenchel a bottle of lemoncello as a gift from her travels. Krebs Decl. Ex. 3 at 286-87. Dr. Fenchel likewise would bring back gifts for Plaintiff after his bigger trips, including: an accordion fan; a bottle of wine (which was also given to all other faculty members); a framed photograph of himself; an embossed metal container with notepaper; a copy of the second volume of his collected papers, and a copy of his book on love and sexuality. Krebs Decl. Ex. 3 at 287-89. Dr. Fenchel gave a copy of his book on love and sexuality to several other Institute employees as well. Krebs Decl. Ex. 3 at 295-97.

50.     Prior to 2005, on three or four occasions, Plaintiff took Dr. Fenchel's arm when they walked back to the Institute from one of their lunch meetings. Krebs Decl. Ex. 3 at 314-15.

51.     Plaintiff put Dr. Fenchel as her emergency contact on her passport in the spring of 2005. Krebs Decl. Ex. 4 at 492.

52.     Aside from the kiss on the neck when Dr. Fenchel told Plaintiff she was going to be the assistant director of the Institute, in the fall of 2005 Plaintiff also kissed Dr. Fenchel goodnight on the lips after he had driven her to drop something off at a colleague's home and then to the subway. Krebs Decl. Ex. 7 at 244-47.

**Allegations of Sexual Harassment**

Physical Behavior

53.     Prior to September 2005, Plaintiff can not identify any physical behavior by Dr. Fenchel that she found objectionable or that she is considering as part of her sexual harassment claim. Krebs Decl. Ex. 3 at 295-301.

54.     Plaintiff claims that Dr. Fenchel began hugging her in September 2005. Krebs Decl. Ex. 3 at 308-09, 317. He came into her office, said good morning and embraced her. Krebs Decl. Ex. 3 at 308-309. He put his arms around her back. Krebs Decl. Ex. 3 at 309. Plaintiff did not say anything about his behavior to Dr. Fenchel at that time. Krebs Decl. Ex. 3 at 310.

55.     Prior to this first hug, however, Dr. Fenchel had hugged Plaintiff when she got

8

off the bus to visit him and his wife in the Poconos.  Krebs Decl. Ex. 3 at 312.  She did not find anything inappropriate about that hug and was not offended by it.  *Id.*

56.    After the first hug in September 2005, Plaintiff testified that Dr. Fenchel began hugging her to say good morning approximately twice weekly.  Krebs Decl. Ex. 3 at 316. The hugs occurred primarily in the morning.  Krebs Decl. Ex. 3 at 322.  Dr. Fenchel occasionally hugged her good-bye in the evening, although that occurred much less frequently. Krebs Decl. Ex. 3 at 323.

57.    Plaintiff had seen Dr. Fenchel hug other faculty members as well, both men and women, when greeting them.  Krebs Decl. Ex. 3 at 368-69.  Dr. Fenchel characterized his physical behavior as "affectionate" (Krebs Decl. Ex. 3 at 300); Plaintiff agreed that the behavior was affectionate but did not deem it appropriate.  Krebs Decl. Ex. 4 at 491.

58.    At the end of September, Plaintiff advised Dr. Fenchel that as her boss, she was uncomfortable with his physicality.  Krebs Decl. Ex. 3 at 324.  Dr. Fenchel told Plaintiff that the Institute was like a family.  Krebs Decl. Ex. 3 at 325.

59.    Approximately one week later, Dr. Fenchel hugged Plaintiff and kissed her. Krebs Decl. Ex. 3 at 329.  This was the first time Dr. Fenchel kissed her.  Krebs Decl. Ex. 3 at 329, 331-32.  Dr. Fenchel greeted her good morning and kissed her on the cheek (a peck) simultaneously with the hug.  Krebs Decl. Ex. 3 at 330.  Plaintiff did not say anything about the hug or kiss to Dr. Fenchel.  Krebs Decl. Ex. 3 at 331, 336.  After this incident, Dr. Fenchel kissed her on the cheek at least twice a week until October 2005.  Krebs Decl. Ex. 3 at 332.  Dr. Fenchel also hugged and kissed Roberta Schechter, a faculty member on the check.  Krebs Decl. Ex. 7 at 301-02.

60.    In October 2005, Dr. Fenchel began to kiss her on the mouth that lasted a few seconds, while hugging her.  Krebs Decl. Ex. 3 at 333-34.  After this behavior began, Plaintiff tried to make sure she was seated at her desk, not standing because it was more difficult for Dr. Fenchel to kiss her while she was seated, and often times he could not actually kiss her.  Krebs Decl. Ex. 3 at  338, 340.  When she was seated, Dr. Fenchel still attempted to kiss her, however, and did kiss her on a twice-weekly basis.  Krebs Decl. Ex. 3 at 341, 344.  She did not say anything to Dr. Fenchel about his kissing her on the lips at that time.  Krebs Decl. Ex. 3 at 338.

61.    Dr. Fenchel occasionally hugged her on occasions other than to greet her.

Krebs Decl. Ex. 3 at 341.  Dr. Fenchel hugged Plaintiff when she seemed upset; he tried to console her because he hated to see her upset.  Krebs Decl. Ex. 7 at 218-19, 221, 258-59, 271.

62.    On two occasions in mid-October 2005, Dr. Fenchel put his hands on her face, pulled her face to his and then rubbed noses with her and kissed her on the lips while she was seated at her desk.  Krebs Decl. Ex. 3 at 343.  Plaintiff did not say anything to Dr. Fenchel regarding these interactions at the time they occurred. Krebs Decl. Ex. 3 at 346.

63.    After the first time Dr. Fenchel rubbed noses with Plaintiff, Plaintiff closed her office door in the mornings.  Krebs Decl. Ex. 3 at 345.  A few days after the second time Dr. Fenchel rubbed noses with Plaintiff, Dr. Fenchel and Plaintiff were discussing business and Plaintiff told Dr. Fenchel that she wanted him to keep his hands off of her.  Krebs Decl. Ex. 3 at 353.

64.    Approximately one week later, during a business meeting at the beginning of November 2005, Dr. Fenchel told Plaintiff she seemed distant and angry.  Krebs Decl. Ex. 3 at 349.  Plaintiff told him that "he knew very well why I was angry."  Krebs Decl. Ex. 3 at 349.  Plaintiff did not say anything else at that meeting.  Krebs Decl. Ex. 3 at 350.

65.    Plaintiff tried to avoid Dr. Fenchel's physical behavior towards her, although he occasionally succeeded.  Krebs Decl. Ex. 3 at 365-66.

66.    After her statements to Dr. Fenchel in the beginning of 2006, Plaintiff did not make any further direct references or protests about the behavior to Dr. Fenchel.  Krebs Decl. Ex. 3 at 362.

67.    At no time did Dr. Fenchel ever verbally tell Plaintiff that he wanted a sexual relationship with her, nor did he touch her in any sexual area of her body.  Krebs Decl. Ex. 3 at 431-32.  In fact, Dr. Fenchel was not physically attracted to Plaintiff.  Krebs Decl. Ex. 6 at 157.

68.    After Dr. Fenchel returned from vacation in the middle of January 2006, Dr. Fenchel sat down in her office and asked Plaintiff whether he had spoken to anybody about what was going on between them.   Krebs Decl. Ex. 3 at 305, 359.  Plaintiff told him she had not done so.  Krebs Decl. Ex. 3 at 359.  Plaintiff then commented that first he first harassed her and now he was threatening her.  Krebs Decl. Ex. 3 at 360.  No actual threat was made,

however.  Krebs Decl. Ex. 3 at 360.  Dr. Fenchel commented about how he felt they could no longer talk to each other and got up and left the office.  Krebs Decl. Ex. 3 at 360-61.

69.     Although Dr. Fenchel would still attempt to kiss or hug her, Plaintiff would merely move away.  Krebs Decl. Ex. 3 at 363.

70.     The hugs and kisses stopped while Dr. Fenchel was away from vacation and when he returned from vacation in 2006 for approximately ten days.  Krebs Decl. Ex. 3 at 320, 336-37.

71.     Plaintiff claims that in the winter of 2005/2006, she was in the hallway outside her office at the Institute during the early afternoon.  Krebs Decl. Ex. 3 at 256-57.  She saw Dr. Fenchel walking toward her with his arms open as if intending to embrace her.  Krebs Decl. Ex. 3 at 259-60.  At this time, Dr. Fenchel had had some health concerns and Plaintiff believes he had received good news.  Krebs Decl. Ex. 3 at 259.

72.     Plaintiff told Dr. Fenchel as he walked toward her that she did not want any more hugging and kissing; in response, Dr. Fenchel walked faster and pushed her out of the way.  Krebs Decl. Ex. 3 at 260; Krebs Decl. Ex. 16

73.     Plaintiff did not have any marks, nor did she need medical attention as a result of the behavior.  Krebs Decl. Ex. 3 at 260.  Dr. Fenchel did not hug or kiss her on that occasion.  Krebs Decl. Ex. 3 at 263.

74.     In July 2006, Dr. Fenchel put his hand on Plaintiff's thigh and rested it there for a moment during a memorial for a student.  Krebs Decl. Ex. 3 at 432-34; Krebs Decl. Ex. 5 at 849.  Dr. Fenchel's wife was seated on the other side of him during the memorial service.  Krebs Decl. Ex. 3 at 433.

75.     Plaintiff admitted that during the course of normal human interaction, she has touched people on the arm to while speaking to them.  Krebs Decl. Ex. 3 at 314.   Plaintiff touched Dr. Fenchel when they conversed.  Krebs Decl. Ex. 3 at 320-332.

Verbal/Written Comments

76.     Plaintiff also relies on communications with Dr. Fenchel, both verbal and written, to support her claims.

77.     In 2001, Dr. Fenchel indicated to Plaintiff that he thought she had a problem

11

with men. Krebs Decl. Ex. 3 at 290-91. She found the comment offensive and believed it to be harassing because it was a discussion of her private motivations. Krebs Decl. Ex. 3 at 291-92. Plaintiff did not believe Dr. Fenchel would have said something similar to a man, although she does not know that for a fact. Krebs Decl. Ex. 3 at 291-92.

78.     Plaintiff responded to Dr. Fenchel's statement in a sarcastic manner, because she believed Dr. Fenchel's comment was actually an expression of a power struggle. Krebs Decl. Ex. 3 at 292.

79.     Plaintiff testified Dr. Fenchel has had "power struggles," with other Institute employees, male and female. Krebs Decl. Ex. 4 at 461.

80.     Although she did not classify them as sexual harassment, Plaintiff claims Dr. Fenchel sporadically made other inappropriate comments between 2001 and 2005, including telling her she was formal, inscrutable and progressing into uptight. Krebs Decl. Ex. 3 at 297-98.

81.     She also claims Dr. Fenchel told her he forbid her from having social interaction with anybody at the Institute. Krebs Decl. Ex. 3 at 299. The comments prior to the fall of 2005 were, however, infrequent. Krebs Decl. Ex. 3 at 302.

82.     Plaintiff claims that prior to the fall of 2005, when she also expressed reluctance regarding any affectionate physicality between them, Dr. Fenchel would tell her that the Institute was like family and to not be so uptight. Krebs Decl. Ex. 3 at 300. That was the extent of inappropriate comments and behavior Plaintiff claims to have experienced by Dr. Fenchel between 2001 and the fall of 2005. Krebs Decl. Ex. 3 at 300-02.

83.     In the fall of 2005 during a business luncheon, Dr. Fenchel commented to Plaintiff that she seemed to be distant from him. Krebs Decl. Ex. 2 at 174. Dr. Fenchel also asked her during this lunch whether she had ever thought of lesbianism. Krebs Decl. Ex. 2 at 175. Plaintiff responded by turning the question back on Dr. Fenchel and asking him if *he* had ever considered homosexuality. Krebs Decl. Ex. 2 at 176-77.

84.     At the time of the luncheon, Dr. Fenchel was working on his book regarding sexuality and thought it curious that research suggested it was more common for women to experiment with homosexuality than men. Krebs Decl. Ex. 3 at 306-07; Krebs Decl. Ex. 2 at 177-78. Accordingly, Dr. Fenchel was asking for Plaintiff's perspective on the subject.

12

Krebs Decl. Ex. 3 at 306-07.

85.    While Dr. Fenchel was writing the book, Plaintiff found a book at Barnes & Noble that dealt with love and literature and art, which she gave to him as a gift. Krebs Decl. Ex. 3 at 285.

86.    On one or two occasions, Dr. Fenchel had signed a memo regarding Institute business, "love, Geri." Krebs Decl. Ex. 3 at 388; Krebs Decl. Ex. 17. Plaintiff never complained about his use of the word "love" in communications to her. Krebs Decl. Ex. 4 at 589-590.

87.    Plaintiff had also, previously, expressed love and affection for Dr. Fenchel as well. Mays Dep. at 394. She did so in 2003, in writing, after spending time in the Poconos with Dr. Fenchel and his wife. Krebs Decl. Ex. 3 at 394-95. Plaintiff also expressed gratitude to Dr. Fenchel for the opportunities he was giving her at the Institute. Krebs Decl. Ex. 3 at 396-97.

88.    During another luncheon in the fall of 2005, Plaintiff claims Dr. Fenchel asked her if it would make a difference if her were not married. Krebs Decl. Ex. 3 at 400-01. Plaintiff responded, "no." Krebs Decl. Ex. 3 at 400-01. Dr. Fenchel did not define the word "it" during that conversation. Krebs Decl. Ex. 3 at 401.

89.    Plaintiff claims that on another occasion in late fall 2005, Dr. Fenchel commented about her having taken off her cardigan at a meeting of staff therapists and students, and that he wished she had taken more off. Krebs Decl. Ex. 3 at 304, 370-71. Plaintiff did not respond or comment to Dr. Fenchel about his statement but changed the subject. Krebs Decl. Ex. 3 at 375. Dr. Fenchel had not and did not make a comment like that at any other time. Krebs Decl. Ex. 3 at 375.

90.    On four to five occasions during the fall/winter of 2005-2006, after she had told him that she did not want any physicality between them in September 2005, Dr. Fenchel commented to Plaintiff that he was concerned about Plaintiff's attitude because they had previously had a good working relationship, but he felt it had changed. Krebs Decl. Ex. 3 at 376-77; Krebs Decl. at 4 at 466. Plaintiff advised Dr. Fenchel only that she would think about it. Krebs Decl. Ex. 3 at 379. Dr. Fenchel did not connect his comments directly to any physical behavior or her alleged attempts to rebuff him. Krebs Decl. Ex. 4 at 468.

91.     The first time Dr. Fenchel made a comment about their strained relationship was in October 2005, after he questioned her about lesbianism. Krebs Decl. Ex. 3 at 377.

92.     The next time Dr. Fenchel discussed their strained relationship occurred just before Thanksgiving vacation.  Krebs Decl. Ex. 3 at 380.  Dr. Fenchel was aware that Plaintiff was going to Virginia to visit her mother at that time.  Krebs Decl. Ex. 3 at 382. Plaintiff visited her mother every year.  Krebs Decl. Ex. 6 at 187.

93.     Dr. Fenchel came into Plaintiff's office to wish her a happy Thanksgiving and told Plaintiff to tell her mother that he loved her, but that she is a handful. Krebs Decl. Ex. 3 at 306, 380-81.  Dr. Fenchel meant that he loved her in the sense that she was doing a good job.  Krebs Decl. Ex. 7 at 401.  Dr. Fenchel told her to tell her mother she was doing very well in her position at the Institute.  Krebs Decl. Ex. 3 at 384.  This was the only occasion on which Dr. Fenchel ever called her a  handful.  Krebs Decl. Ex. 3 at 383.

94.     Plaintiff did not believe Dr. Fenchel would have made a similar comment to anybody else, whether a man or a woman.  Krebs Decl. Ex. 4 at 508.  She characterized the statement as being one that a parent makes to a child. Krebs Decl. Ex. 4 at 509.

95.     Dr. Fenchel also invited Plaintiff to dinner on three occasions, although she only went with him once. Krebs Decl. Ex. 4 at 478-79.  On one occasion she declined and on the other, she indicated she would think about it and later declined.  *Id.*  All three times, Dr. Fenchel indicated that his wife was unavailable and did not want to eat alone.  Krebs Decl. Ex. 4 at 481; Krebs Decl. Ex. 7 at 254-55, 272-77.

96.     Dr. Fenchel had asked other Institute employees to dinner when his wife was unavailable, as well. Krebs Decl. Ex. 7 at 280-82.  Dr. Fenchel did not indicate there would be any repercussions if she did not accept his dinner invitations.  Krebs Decl. Ex. 4 at 482.

97.     After the last time he asked Plaintiff to dinner and she declined after saying she would let him know, Dr. Fenchel sent Plaintiff an undated letter indicating his disappointment with her having vacillated on the invitation, thus holding him up.  Krebs Decl. Ex. 4 at 489; Krebs Decl. Ex. 7 at 277-78; Krebs Decl. Ex. 18.  Dr. Fenchel also addressed the signs of strain on their relationship and noted that Plaintiff was banging doors and acting out.  Krebs Decl. Ex. 18.  Plaintiff believed the tone of the letter reflected someone who felt spurned romantically, especially when the letter referenced his disappointment with her response to his invitations to dinner. Krebs Decl. Ex. 4 at 648, 650.

14

Although Dr. Fenchel was disappointed she had turned down the invitation, he did not actually criticize her for doing so. Krebs Decl. Ex. 7 at 272-78.

98.    Plaintiff admitted she had previously slammed doors, as the letter indicated. Krebs Decl. Ex. 4 at 499, 504.

99.    On December 1, 2005, Dr. Fenchel sent Plaintiff another letter indicating his belief that they used to have a good and personal relationship, which had soured. Krebs Decl. Ex. 4 at 592; Krebs Decl. Ex. 19. Plaintiff believed Dr. Fenchel was discussing their personal relationship rather than a working relationship, although it does not actually state that. Krebs Decl. Ex. 4 at 594. Plaintiff also believed Dr. Fenchel was again rebuffing her for rejecting his dinner invitations in the letter, because he noted that she was short with him when she told him she could not accept the invitation. Krebs Decl. Ex. 4 at 594. Dr. Fenchel explained the he felt he deserved more than just her curt response. Krebs Decl. Ex. 19.

100.    She found various other portions of the letter objectionable as well, believing they were said in response to her rebuff of his advances and contained romantic overtones rather than business. Krebs Decl. Ex. 4 at 600-05. Plaintiff admitted she had previously had a good working relationship with Dr. Fenchel and she had thanked him for it on several occasions. Krebs Decl. Ex. 4 at 607.

101.    However, Plaintiff was uncomfortable with the words in Dr. Fenchel's December 1, 2005 letter, as she believed them not to be those of a boss who appreciates her work. Krebs Decl. Ex. 4 at 608. Plaintiff believed his reference back to his statement during Thanksgiving that she tell her mother that he loved her and took pleasure in her was further inappropriate, especially in the context of his behavior during this period. Krebs Decl. Ex. 4 at 608.

102.    Plaintiff also found it inappropriate that Dr. Fenchel commented in the letter that they could not have a normal conversation. Krebs Decl. Ex. 4 at 612. She believed Dr. Fenchel was threatening her when he noted he was considering whether to find an interested party to replace him. Krebs Decl. Ex. 4 at 612-13. She also claimed he was threatening to give her time off without pay, though the letter does not say that. Krebs Decl. Ex. 4 at 613-14.

103.    She did not know whether or not at that time, she was actually ready to take

over the director position.  Krebs Decl. Ex. 4 at 615.

104.    On December 8, 2005 Plaintiff drafted a responsive letter to Dr. Fenchel. Krebs Decl. Ex. 4 at 633-35; Krebs Decl. Ex. 20.  In the letter, she noted that they both shared a vision and dedication to the Institute, looked "forward to a continuing good working relationship with" Dr. Fenchel,  and anticipated they could work through their issues.  Krebs Decl. Ex. 20.

105.    Dr. Fenchel wrote another letter to Plaintiff on or about December 12, 2005, which Plaintiff believed contained more inappropriate sentiment.  Krebs Decl. Ex. 4 at 619; Krebs Decl. Ex. 21.  Although Dr. Fenchel stated that Plaintiff had labeled him the devil, she denies that she ever made such a statement.   Krebs Decl. Ex. 4 at 621.   Plaintiff also believed this letter was intended to criticize her and put her down for objecting to Dr. Fenchel's physical behavior towards her because it referenced following their "pious" intentions.  Krebs Decl. Ex. 4 at 622.

106.    In a letter Dr. Fenchel sent to Plaintiff dated December 13, 2005, Plaintiff alleges Dr. Fenchel said he had had an erotic dream about her.  Krebs Decl. Ex. 4 at 493-94; Krebs Decl. Ex. 22.  The letter does not actually state that he had an "erotic" dream, however, but rather states only that he had a dream in which he experienced Eros over Thanatos.  Krebs Dec. Ex. 22.  He also referred to an "innocent Christian woman," which Plaintiff believed was a reference to her.  Krebs Decl. Ex. 4 at 494.  Eros has to do with love and Thanatos has to do with death.  Krebs Decl. Ex. 4 at 495.

107.    However, Dr. Fenchel did not intend his reference to be sexual or erotic. Krebs Decl. Ex. 9 at 697-701.  Indeed, he made up the dream and was merely tried to show a humorous example of how Plaintiff allegedly experienced him.  Id.  Dr. Fenchel was using the Thanatos and Eros references in the Freudian sense.  Krebs Decl. Ex. 9 at 703.  He believed Plaintiff could not distinguish between kindness and love from sexuality.  Krebs Decl. Ex. 9 at 704.

108.    In the December 13, 2005 letter, Dr. Fenchel further noted his frustration with Plaintiff's slamming of doors, which she admitted she had previously done. Krebs Decl. Ex. 4 at 499, 504; Krebs Decl. Ex 22.  Plaintiff also believe that Dr. Fenchel was criticizing her in the letter for asking him to stay five feet away and for expressing her "rage."  Krebs Decl. Ex. 4 at 503-04.  Plaintiff also believed Dr. Fenchel to be making a "veiled threat," by noting

that he hoped their professional relationship did not sour. Krebs Decl. Ex. 4 at 511-12.

109. Plaintiff further disagreed with what we she believed was Dr. Fenchel's attempt to diagnose her in this same letter, when he cautioned that she was involved in "oedipal dynamics," based upon her reaction to his having called her a handful. Krebs Decl. Ex. 4 at 511; Krebs Decl. Ex. 22. In the same letter, Dr. Fenchel also called Ms. Karlen a "handful." Krebs Decl. Ex. 4 at 511.

110. Dr. Fenchel prepared and sent another note to Plaintiff on December 15, 2005, which Plaintiff believed as inappropriate. Krebs Decl. Ex. 4 at 644; Krebs Decl. Ex. 23. Plaintiff believed the last line of the note indicated that she could continue with the Institute if she gave in to Dr. Fenchel's romantic sexualized behavior towards him. Krebs Decl. Ex. 4 at 645. It does not actually say those things in the letter, however, and is merely Plaintiff's interpretation of the language. Krebs Decl. Ex. 4 at 645.

111. In a letter dated January 5, 2006, Dr. Fenchel noted he missed phone calls between them on Tuesdays and Thursday. Krebs Decl. Ex. 4 at 654; Krebs Decl. Ex. 24. Dr. Fenchel wrote that it was lonely without their conversation and noted that he was looking out for her and was her friend, even if it was not reciprocated. *Id.* Plaintiff believed he wanted the phone calls to be personal. Krebs Decl. Ex. 4 at 654.

112. On March 2, 2006, Dr. Fenchel sent Plaintiff another letter. Krebs Decl. Ex. 25. Plaintiff believed Dr. Fenchel's statement that, "if I can do it, you can do it if you want," was inappropriate. Krebs Decl. Ex. 4 at 669-72. She believed his words to actually be a discussion of her successorship to the director position because he had made references to the past. Krebs Decl. Ex. 4 at 669-71; Krebs Decl. Ex. 25. However, she noted there was nothing in the letter that actually referenced the director role. Krebs Decl. Ex. 4 at 672. She further believed that in that same paragraph, he was criticizing her for asserting herself with him with regard to his physical behavior when he noted that she was not "at ease with asserting yourself with 'nice' women or even more assertive women as compared to men." Krebs Decl. Ex. 4 at 673.

113. Even after his multiple letters to Plaintiff, in May 2006, Plaintiff drafted a note to Dr. Fenchel which was very cordial and friendly. Krebs Decl. Ex. 26. She welcomed him back from his vacation warmly. *Id.*

114. Plaintiff testified that none of Dr. Fenchel's behavior interfered with her ability

17

to performer her job duties.  Krebs Decl. Ex. 3 at 366-67.

115.   Plaintiff claims that, when she began to express concern in the spring of 2006 as to whether Dr. Fenchel would recommend her to the Board as Dr. Fenchel's successor, Dr. Fenchel attempted to reassure her and told her to trust him and that he loved her. Krebs Decl. Ex. 3 at 390.

116.   Dr. Fenchel had previously advised the Board of his recommendation that Plaintiff be considered as his successor on several occasions.  Krebs Decl. Ex. 27. However, Dr. Fenchel did have some concerns about Plaintiff being ready at that time, because Plaintiff had been having outbursts at work, which included slamming doors and yelling. Krebs Decl. Ex. 8 at 593-95.

117.   Dr. Fenchel told Plaintiff in a letter dated February 15, 2006 he would make the recommendation to the board. Krebs Decl. Ex. 28. He noted that he did not realize how important the position was to her and noted that if they could not work together, perhaps he would semi-retire. Krebs Decl. Ex. 3 at 425; Krebs Decl. Ex. 28  Dr. Fenchel did not state in that letter to Plaintiff that he would make the recommendation at the June 2006 board meeting. Krebs Decl. Ex. 3 at 420-21, 438.

118.   Dr. Fenchel told Plaintiff that he would recommend her as his successor because he had never before recommended her while she was in the room.  Krebs Decl. Ex. 3 at 419. Plaintiff did not know whether Dr. Fenchel had recommended her to the Board outside of her presence. Krebs Decl. Ex. 3 at 390.

119.   Plaintiff attended the June 2006 board meeting.  Krebs Decl. Ex. 3 at 418. Plaintiff wanted to hear Dr. Fenchel advise the board of his recommendation of her to allay her fears. Krebs Decl. Ex. 3 at 424. She did not imply or indicate that Dr. Fenchel should set a date on which she would take over the position.  Krebs Decl. Ex. 3 at 425.

120.   Dr. Fenchel did not, however, raise the issue of naming Plaintiff as his successor at this particular meeting.  Krebs Decl. Ex. 3 at 439.  Later in the day, Plaintiff approached Dr. Fenchel and asked him why he had not said anything about her during the meeting. Krebs Decl. Ex. 3 at 444.  He told her that it was not yet time.  Krebs Decl. Ex. 3 at 445.

121.   After the June 2006 board meeting, Plaintiff heard Dr. Fenchel tell Marvin

Weinstein to make Plaintiff one of the beneficiaries of one of his life insurance policies. Krebs Decl. Ex. 3 at 306-07, 392, 442. He told her, "See, I do love you." Krebs Decl. Ex. 3 at 392.

122. Finally, Dr. Fenchel wrote Plaintiff another letter dated June 22, 2006. Krebs Decl. Ex. 4 at 675-76; Krebs Decl. Ex. 29. In the letter, Dr. Fenchel joked that Plaintiff wanted to keep him alive with cod liver oil. *Id.* Plaintiff had given him cod liver oil when Dr. Fenchel was having difficulty moving his bowels. Krebs Decl. Ex. 4 at 678. At the end of the note, he joked that Plaintiff should think of another way to him alive and then she would be kept alive as well. Krebs Decl. Ex. 4 at 677. Plaintiff found this last sentence objectionable because she believed it was actually a reference to the "conditions" he was placing on her in order to succeed him. Krebs Decl. Ex. 4 at 677. There is, however, no actual reference in the note to that issue. Krebs Decl. Ex. 4 at 677.

Discussions and Complaints about Dr. Fenchel's Behavior

123. Shortly after the lunch in which Dr. Fenchel asked Plaintiff whether she had ever thought of lesbianism, Plaintiff spoke with Marc Angers, faculty supervisor at the Institute, Dr. Natalie Riccio, a member of the faculty and a clinical supervisor, Dr. Gibbs Williams, a faculty member, and Dr. Arno Karlen, an adjunct faulty member, about Dr. Fenchel's comment. Krebs Decl. Ex. 2 at 189, 192, 222, 227. Plaintiff did not purposely seek out any of them to discuss the issue. Krebs Decl. Ex. 2 at 190, 193, 227. However, she advised each of them that Dr. Fenchel had hugged and kissed her and had asked her if she had considered lesbianism. Krebs Decl. Ex. 2 at 190, 193, 225, 227, 249.

124. She did not, however, ask any of the individuals she told to do anything about the situation or her experiences. Krebs Decl. Ex. 2 at 191, 195, 225.

125. Plaintiff also advised Barbara Karlen, the administrative coordinator at the Institute, about Dr. Fenchel's inquiry about lesbianism, shortly after it happened. Krebs Decl. Ex. 2 at 200-01. Plaintiff advised Ms. Karlen of the comment because she was the only other administrative person at the Institute, and Plaintiff felt she had to report her experiences to somebody. Krebs Decl. Ex. 2 at 203. Ms. Karlen commented that she sensed tension between Plaintiff and Dr. Fenchel. Krebs Decl. Ex. 3 at 409. Plaintiff told Ms. Karlen she was very astute, to which Ms. Karlen noted it was sometimes difficult to work with Dr. Fenchel. Krebs Decl. Ex. 3 at 409-10. Plaintiff then advised Ms. Karlen that

Dr. Fenchel was hugging and kissing her. Krebs Decl. Ex. 3 at 410. Plaintiff did not ask Ms. Karlen to do anything. Krebs Decl. Ex. 3 at 412.

126.    Plaintiff also spoke with Ms. Karlen after Dr. Fenchel bumped into her in the hall. Krebs Decl. Ex. 3 at 264. Ms. Karlen told Plaintiff Dr. Fenchel had asked her what was wrong with Plaintiff. Krebs Decl. Ex. 3 at 265. Plaintiff told Ms. Karlen that he continued to try to hug and kiss her and pushed her against the wall. Krebs Decl. Ex. 3 at 266. Plaintiff did not ask Ms. Karlen to do anything about the behavior. Krebs Decl. Ex. 3 at 266.

127.    Ms. Karlen suggested to Plaintiff she might want to go to the Board. Krebs Decl. Ex. 3 at 267. Plaintiff, however, never did so. Krebs Decl. Ex. 3 at 267.

128.    The third conversation with Ms. Karlen occurred in June 2006 after the June Board meeting. Krebs Decl. Ex. 3 at 414. Ms. Karlen told her Dr. Fenchel had inquired of her what was wrong with Plaintiff. Krebs Decl. Ex. 3 at 413. Plaintiff told Ms. Karlen that she was angry and felt that Dr. Fenchel's intent to make her a beneficiary of his life insurance policy was insulting. Krebs Decl. Ex. 3 at 416. She also told her that she told Dr. Fenchel in response that all she was interested in was Dr. Fenchel honoring his promise about her work at the Institute. Krebs Decl. Ex. 3 at 416.

129.    Plaintiff also told Ms. Karlen during this conversation that she had been unable to sleep and did not know how much long she could keep going. Krebs Decl. Ex. 3 at 417. Ms. Karlen responded that she hoped Plaintiff would continue at the Institute. Krebs Decl. Ex. 3 at 417-18. Plaintiff did not ask Ms. Karlen to doing anything. Krebs Decl. Ex. 3 at 416-17.

**Steven Robles**

130.    Plaintiff also claims she was harassed by Steve Robles on one occasion in 2004. Krebs Decl. Ex. 4 at 516-17. Plaintiff invited Mr. Robles to lunch. Krebs Decl. Ex. 4 at 518-19. During that lunch, Mr. Robles slid around the booth next to her and put his arm around her. Krebs Decl. Ex. 4 at 517. Plaintiff asked him to take his hand off of her shoulder; he did not do so, but said that he thought they were going to get to know one another. Krebs Decl. Ex. 4 at 520. Plaintiff told him she considered him only a colleague. Krebs Decl. Ex. 4 at 520. Mr. Robles repeated that he thought they could have a good time

together.  Krebs Decl. Ex. 4 at 522.  Plaintiff took his arm off of her and told him she thought
he was married.  Krebs Decl. Ex. 4 at 522.  Plaintiff then put down her menu and told him
she was going to leave.  Krebs Decl. Ex. 4 at 524.

131.    Plaintiff advised only Dr. Fenchel of this encounter.  Krebs Decl. Ex. 4 at 525.
He asked her if she wanted him to do anything about the encounter, but Plaintiff told him no,
that she would handle it if necessary.  Krebs Decl. Ex. 4 at 527.

132.    This was the only incident of alleged harassment Plaintiff claims to have
experienced by Mr. Robles.  Krebs Decl. Ex. 4 at 527-28.  Other than this incident and her
interactions with Dr. Fenchel, there are no other incidents that form the basis of her claims.
*Id.*

## Plaintiff's Resignation

133.    In February 2006, prior to her final and permanent resignation in August
2006, Plaintiff prepared a letter for her resignation and advised Ms. Karlen of her intention
to resign.  Krebs Decl. Ex. 4 at 656k 662-63; Krebs Decl. Exs 30-31.  Plaintiff did not
actually resign at that time. Krebs Decl. Ex. 4 at 657.

134.    Plaintiff spoke to Dr. Fenchel about her threat to resign.  Krebs Decl. Ex. 4 at
658.  He advised her that if she told him what the problem was, he would try to change it so
she would not leave.  Krebs Decl. Ex. 4 at 658.  Plaintiff told him he should stop his
physicality with her.  Krebs Decl. Ex. 4 at 659.

135.    Six months later, on August 11, 2006, Plaintiff was about to depart on a two
and a half week vacation to Virginia.  Krebs Decl. Ex. 4 at 532, 538.  Plaintiff had already
taken off two weeks at the end of May prior to her planned August vacation, and was paid
for both of those weeks.  Krebs Decl. Ex. 4 at 537-38.

136.    Dr. Fenchel was away in Europe at this time, and had been away since the
end of July or beginning of August.  Krebs Decl. Ex. 4 at 529-30, Krebs Decl. Ex. 4 at 532;
Krebs Decl. Ex. 8 at 624-25.

137.    When Plaintiff received the check, she believed it to be incorrect, and gave it
back to Ms. Maxine Exum, the bookkeeper, with a note indicating as such.  Krebs Decl. Ex.
4 at 533.

138.   Ms. Exum went to Plaintiff's office and told Plaintiff that before Dr. Fenchel went on vacation, he had advised her not pay Plaintiff for the time she was going to be away.   Krebs Decl. Ex. 4 at 533.   Ms. Exum indicated Plaintiff could contact Marvin Weinstein, a board member, if she had any questions.   Krebs Decl. Ex. 4 at 535.

139.   Plaintiff contacted Mr. Weinstein via telephone about not being paid for her vacation.   Krebs Decl. Ex. 4 at 538.   Mr. Weinstein told her that Dr. Fenchel had said she had already taken too much time away.   Krebs Decl. Ex. 4 at 539.

140.   Plaintiff advised Mr. Weinstein that he had no idea what went on at the Institute and that she would not work with Dr. Fenchel one more minute.   Krebs Decl. Ex. 4 at 540.   Plaintiff did not explain her comments to Mr. Weinstein any further.   Krebs Decl. Ex. 4 at 540.

141.   Plaintiff then proceeded to contact Dr. Fenchel via telephone in Europe. Krebs Decl. Ex. 4 at 540-41.   It was 9:00 p.m. where Dr. Fenchel was.   Krebs Decl. Ex. 8 at 620.   Plaintiff had not communicated with him while Dr. Fenchel was on vacation prior to this phone call.   Krebs Decl. Ex. 4 at 531.

142.   Plaintiff asked Dr. Fenchel about payment for her vacation time.   Krebs Decl. Ex. 4 at 543; Krebs Decl. Ex. 8 at 620-21.   Dr. Fenchel indicated that he did not want to discuss this during his vacation and they could discuss the issue when he returned from Europe.   Krebs Decl. Ex. 4 at 543-44.   Plaintiff told Dr. Fenchel that she would not work for him anymore and hung up the phone.   Krebs Decl. Ex. 4 at 544; Krebs Decl. Ex. 8 at 620-21.

143.   Plaintiff then  began composing a letter of resignation.   Krebs Decl. Ex. 4 at 547; Krebs Decl. Ex. 16.   Plaintiff drafted the letter, made several copies and signed it after printing it on Institute stationery.   Krebs Decl. Ex. 4 at 554.   Plaintiff mailed copies of the letter to each of the board members (Dr. Fenchel, Mr. Weinstein, Mr. Wolman, Mr. Spiller, Mr. Fenchel and Dr. Marcus) and left that day.   Krebs Decl. Ex. 4 at 554.

144.   Plaintiff also advised Ms. Karlen that she was resigning.   Krebs Decl. Ex. 4 at 555.

145.   On her way out, Plaintiff took materials she was working on for accreditation of the Institute with the intention of trying to work on it while away on vacation, even though

22

she had just resigned.  Krebs Decl. Ex. 4 at 557.

146.   In total, the payment Plaintiff had not received for vacation was a "very little" amount – only a few hundred dollars.  Krebs Decl. Ex. 4 at 545.

147.   Plaintiff believed Dr. Fenchel's refusal to pay her was retaliatory.  Krebs Decl. Ex. 4 at 548.  At no time, however, did Dr. Fenchel connect his decision with respect to the vacation to any of the alleged conduct Plaintiff found inappropriate.  Krebs Decl. Ex. 4 at 548; Krebs Decl. Ex. 8 at 621-22.

148.   After Plaintiff's resignation, Dr. Fenchel wrote three notes to Plaintiff.  Krebs Decl. Ex. 4 at 560; Krebs Decl. Exs. 32, 33, 34.

149.   In the first note dated August 14, 2006, Dr. Fenchel recognized her anger, and noted that he would have been happy to speak to her about it and hoped they could work things out.  Krebs Decl. Ex. 32.

150.   In the second note, dated August 25, 2006, Dr. Fenchel told her that if she would like to reconsider, he would be glad to discuss it and noted that he had not had an opportunity to appropriately respond to her phone call.  Krebs Decl. Ex. 33.

151.   Finally, Dr. Fenchel had brought a gift back for Plaintiff and he left the gift with a note in which he expressed his wish that they could iron things out.  Krebs Decl. Ex. 34. Dr. Fenchel indicated he would like to speak with her further and did not want her to leave the Institute.  Krebs Decl. Ex. 4 at 562.

152.   Plaintiff understood Dr. Fenchel was asking her to come back to WSI and she could have her job back.  Krebs Decl. Ex. 4 at 562.

Dated:   New York, New York
          March 19, 2010

Respectfully Submitted,

GORDON & REES, LLP

By:

Diane Krebs (DK 8280)
Brooke Schneider (BS 2379)
Attorneys for Defendants
90 Broad Street
23rd Floor
New York, NY 10004
(212) 269-5500

23